## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **QUN ZHOU** | ) | |
| **10173 Bracken Drive** | ) | |
| **Ellicott City, Maryland 21042** | ) | |
| | ) | |
| *Plaintiff,* | ) | **Case No.: 1:25-cv-3357** |
| | ) | |
| **v.** | ) | **Jury Trial Demand** |
| | ) | |
| **UNIVERSITY OF MARYLAND,** | ) | |
| **BALTIMORE** | ) | |
| **220 Arch Street, 14th Floor** | ) | |
| **Baltimore, Maryland 21201,** | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## COMPLAINT

Dr. Qun Zhou, Ph.D. ("Dr. Zhou," or "Plaintiff"), hereby files this Complaint against University of Maryland, Baltimore ("UMB," or "Defendant"). Plaintiff seeks relief pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and seeks damages, including but not limited to declaratory, injunctive, and other equitable relief; compensatory damages; and litigation expenses and reasonable attorneys' fees based on Defendant's discriminatory, harassing, retaliatory, and otherwise unlawful actions against Plaintiff.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331.

2.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because the unlawful employment practices and retaliatory actions occurred within this judicial district, and the Defendant may be found in this judicial district.

1

**PARTIES**

3.      Plaintiff Dr. Zhou is a citizen and resident of Maryland. He was employed by UMB from 2008 until his termination in 2023.

4.      UMB is a constituent institution of the University System of Maryland and is a public university in Maryland and an employer within the meaning of the statutes under which Plaintiff brings his claims.

**FACTS**

5.      Dr. Zhou, who is of Asian-Chinese origin, joined UMB's School of Medicine's Department of Biochemistry and Molecular Biology as an Assistant Professor in November 2008. The department was chaired by Dr. Richard Eckert ("Dr. Eckert"). As department chair, Dr. Eckert served as Dr. Zhou's supervisor from November 2008 until March 2023.

6.      Dr. Zhou established a research laboratory focused on breast cancer, where he supervised graduate and medical students, advanced UMB's academic mission, and built a record of accomplishment in research and teaching. In 2014, UMB promoted Dr. Zhou to the rank of Associate Professor with tenure, recognizing his achievements in research and scholarship. The rights and responsibilities of UMB as the employer and of Dr. Zhou as a tenured associate professor were set forth in UMB's Faculty Handbook, and other UMB policies.

7.      Dr. Zhou maintained a fully funded research laboratory, where he mentored Ph.D. and medical students, furthering UMB's academic mission. Dr. Zhou was required by Dr. Eckert to secure external funding, primarily through the National Institutes of Health (NIH) grants and other competitive sources. As department chair, Dr. Eckert held final authority over approving Dr. Zhou's grant application budgets and deciding whether his proposals could be formally submitted.

8.     Dr. Zhou maintained external funding through National Institutes of Health ("NIH") grants and other competitive sources. As principal investigator, he bore responsibility for designing and conducting experiments, ensuring scientific integrity, and reporting results.

9.     During his tenure at UMB, Dr. Zhou received significantly fewer non-pecuniary resources compared to his colleagues. Between 2014 and 2023, Dr. Zhou received little to no mentorship, and UMB failed to conduct required annual progress reviews of his work. This lack of support impaired his professional development. Dr. Zhou was the only faculty member of Chinese national origin in his department's building.

10.     Department Chair Dr. Richard Eckert made discriminatory remarks to Dr. Zhou, including statements that he did not want Dr. Zhou in the department. Dr. Eckert interfered with Dr. Zhou's ability to mentor students and postdoctoral fellows by communicating directly with them and excluding Dr. Zhou from supervision of their projects. For example, Dr. Eckert communicated directly with Dr. Zhou's postdoctoral colleague, Dr. Nadire Duru, about her projects and data while excluding Dr. Zhou, despite Dr. Zhou being her principal investigator.

11.     On June 12, 2017, Dr. Eckert approved the data that Dr. Duru used in her NIH K22 grant application without consulting Dr. Zhou, even though Dr. Zhou was directly responsible for her research. This interference undermined Dr. Zhou's authority and deprived him of his rightful role in supervising Dr. Duru's work, including overseeing the data collection and reporting for her grant.

12.     On September 11, 2017, after reviewing Dr. Duru's data, Dr. Zhou notified Dr. Eckert of significant concerns in her K22 application and manuscript. Dr. Eckert directed Dr. Zhou to have Dr. Duru correct the data. On November 1, 2017, Dr. Eckert transferred Dr. Duru from Dr. Zhou's laboratory to the laboratory of Dr. Toni Antalis at UMB's Center for Vascular & Inflammatory Diseases.

13.     On July 30, 2018, UMB President Dr. Bruce Jarrell sent a letter to Dr. Zhou and Dr. Duru notifying them of allegations by "an anonymous complainant." The two allegations charged that Dr. Duru, who was the first author and who conducted most of the relevant research, manipulated images in her Oncotarget research paper (2016), and in her NIH K22 grant proposal. The images in the allegations were the same images that Dr. Zhou reported to Dr. Eckert on or about September 11, 2017

14.     The UMB Policy and Procedures Concerning Research Misconduct ("UMB Policy") requires "Upon deciding to proceed with an Inquiry, the Responsible Official will gather and sequester all original data and other original records relevant to the issues on or before the date which the Respondent is notified or the Inquiry begins, whichever is earlier."

15.     On or about July 30, 2018, UMB Research Integrity Officer Dr. Vigues notified Dr. Zhou that UMB had decided to initiate an inquiry into the allegations and subsequently sequestered Dr. Zhou's office computers. During this process, Dr. Vigues observed Dr. Zhou's lab notebooks in both his office and his lab, noting that they contained evidence relevant to the allegations. However, Dr. Vigues chose not to sequester the notebooks, stating that UMB did not require them at that time. On August 9, 2018, UMB appointed the inquiry committee.

16.     On or about on November 5, 2018, Dr. Zhou received the inquiry committee report signed by the inquiry committee chair Dr. Robert Ernst dated October 2, 2018 ("the Inquiry Report"). The Inquiry Report did request "an Investigation Committee be empaneled and that the Investigation Committee request additional information regarding papers and grants produced in the Zhou lab." The inquiry committee stated that additional investigation will determine "responsibility for misconduct, if any." The inquiry committee requested that Dr. Duru's publications and her NIH K22 grant should be investigated. During the investigation, Dr. Duru, and Dr. Zhou were respondents.

17.    UMB failed to sequester all relevant records, including Dr. Zhou's notebooks, in violation of federal regulations and its own policies.

18.    UMB Policy, which incorporated U.S. Public Health Service Regulations (42 C.F.R. § 93) and the Federal Policy on Research Misconduct (65 FR 76260), legally obligates the university to conduct research misconduct investigations in a fair and non-discriminatory manner. These investigations must follow defined procedures and require that allegations be proven by a preponderance of the evidence. Crucially, under 42 C.F.R. § 93.310(f), UMB must "ensure an impartial and unbiased investigation to the maximum extent practicable." This included appointing committee members without unresolved conflicts of interest. UMB Policy VII(B) reinforced this duty by requiring all committee members to disclose any material conflict.

19.    On December 6, 2018, UMB formally notified Dr. Zhou that the investigation would be a joint proceeding with the Department of Veterans Affairs. Dr. Achsah Keegan ("Dr. Keegan") was appointed to represent the VA on the committee. UMB failed to fully disclose a key detail about Dr. Keegan.  She was identified only as a professor of microbiology and immunology, which led Dr. Zhou to reasonably assume this was her primary department. UMB omitted the material fact that her primary appointment was within the Center for Vascular & Inflammatory Diseases ("CVID"), where Dr. Duru worked and where Dr. Toni Antalis, Dr. Duru's mentor, served as Associate Director. UMB did not disclose this relationship at the outset.

20.    In January 2019, UMB convened an investigation committee to review allegations of research misconduct against Dr. Zhou. The committee was chaired by Dr. Bruce Krueger, Professor in the Department of Physiology, and included Dr. Achsah Keegan as a member.

21.    On January 30, 2019, the investigation committee interviewed Dr. Duru regarding the allegations against her. During the same year, the committee also interviewed Dr. Zhou and other

lab members, including Drs. Ramkishore Gernapudi, Pang-kuo Lo, and Justine Yu. During the January 30, 2019, meeting, the committee asked Dr. Vigues about Dr. Duru's laboratory notebooks. Dr. Vigues responded that they could request them, but he did not follow through. Throughout 2019, Dr. Vigues met with Dr. Zhou multiple times in his office to collect computers and external drives. He observed experimental notebooks but declined to collect them, later reporting to the committee that Dr. Zhou had none.

22.     On February 8, 2019, despite having seen the notebooks, Dr. Vigues falsely reported to the investigation committee that Dr. Zhou's laboratory had no experimental notebooks. On April 9, 2019, Dr. Vigues returned to Dr. Zhou's office to collect computers. When Dr. Zhou asked whether UMB wanted to collect the notebooks, Dr. Vigues responded that they were not required at that time.

23.     On November 15, 2019, while Dr. Zhou's case remained ongoing, UMB's own investigation concluded that Dr. Eckert had engaged in research misconduct in at least thirteen publications and two grant proposals. Despite these findings, UMB promoted Dr. Eckert to Deputy Director of the UMB Cancer Center the same month.

24.     The investigation against Dr. Zhou, in contrast, continued for more than five years, subjecting him to protracted scrutiny far beyond what was imposed on Dr. Eckert. UMB systematically discriminated and retaliated against Dr. Zhou by erasing his academic contributions while permitting other faculty found guilty of research misconduct to retain their privileges. This campaign began when UMB improperly removed Dr. Zhou as supervisor of his Ph.D. student Ms. Justine Yu. On or about February 20, 2020, without justification, UMB—through Dr. Toni Antalis (Molecular Medicine Training Director)—removed Dr. Zhou from Ms. Justine Yu's thesis committee and terminated his role as her advisor. UMB then appointed Dr. Vitolo as Ms. Justine

Yu's thesis advisor, falsely representing as her sole mentor in both her public defense (May 2020) and final dissertation submission.

25.     This treatment stands in stark contrast to UMB's handling of two faculty comparators Dr. Eckert and Dr. Anil Jaiswal (Indian, Department of Pharmacology) who were not in the same protected class as Dr. Zhou. Despite being found responsible for data fabrication in 13 and 23+ publications respectively, both retained their mentorship roles and publication credits throughout and after investigations. Dr. Eckert continued supervising graduate students Xi Chen and Geraldine Ezeka even after UMB's November 2019 misconduct determination, while Dr. Jaiswal faced no apparent consequences for his falsifications. UMB's treatment of these comparators reveals a stark disparity: despite clear findings of misconduct against Drs. Eckert and Jaiswal, no restrictions were imposed. Conversely, Dr. Zhou was preemptively punished prior to any investigation conclusion.

26.     On April 7, 2020, Dr. Zhou discovered Dr. Keegan's affiliation through her publications and emailed Dr. Vigues requesting her removal from the committee due to conflict of interest. On the same day, Dr. Zhou raised concerns about a second conflict: Dr. Krueger, the committee chair, worked in the same department where Dr. Duru held a secondary appointment. UMB did not act on these objections.

27.     On May 7, 2020, UMB Vice President Roger Ward acknowledged concerns about Dr. Keegan's involvement and added Dr. Tibor Kristina to the committee. Yet UMB allowed Dr. Keegan to remain as a "scientific consultant," over Dr. Zhou's objections. On May 11, 2020, Dr. Zhou submitted a written request for an unbiased committee. UMB denied this request.

28.     On June 3, 2020, Dr. Zhou again emailed Dr. Vigues, reiterating his objections to Dr. Keegan's continued involvement. UMB did not respond, and instead, Dr. Vigues began treating Dr. Zhou in an adversarial and retaliatory manner. On August 18, 2020, Dr. Vigues scheduled Dr. Zhou's

interview for September 2, 2020, and on September 24, 2020, he sent Dr. Zhou the transcript, demanding corrections within two weeks instead of the usual four.

29.    On October 20, 2020, Dr. Vigues notified Dr. Zhou that the committee had scheduled its fifth interview for November 5, 10, or 12, and required Dr. Zhou to hold all dates open.

30.    On October 26, 2020, when Dr. Zhou proposed alternative dates due to teaching obligations, Dr. Vigues threatened to report his lack of cooperation to the U.S. Office of Research Integrity.

31.    On December 10, 2020, during the rescheduled interview, Dr. Zhou attempted to ask questions and present additional evidence. Dr. Vigues interrupted him, stating: "Who is doing the interview here, is it you? Or is it us?" He further mocked Dr. Zhou, saying, "You are very stressful. That is good. That is good. Okay. Let us continue."

32.    At this time, Dr. Zhou was undergoing treatment for high blood pressure and memory issues. Instead of accommodating his health needs, UMB escalated its hostility.

33.    Federal regulations strictly prohibit disclosure of a respondent's identity during a research misconduct investigation except on a need-to-know basis. Despite this, in early 2021 UMB employees disclosed details of Dr. Zhou's case to colleagues who had no role in the proceedings.

34.    On February 4, 2021, Dr. Michele Vitolo confirmed that Research Integrity Officer Dr. Vigues had been "dealing with issues surrounding Dr. Zhou and his research." As a result, at least four additional individuals learned of the investigation, including colleagues at both UMB and the VA. The disclosure caused reputational harm. Collaborators withdrew from projects, colleagues avoided Dr. Zhou, and his professional relationships were destroyed, even while the investigation remained pending.

8

35.     In contrast, UMB maintained confidentiality for Dr. Duru and Dr. Eckert, who were also under investigation, protecting their reputations while destroying Dr. Zhou's.

36.     On February 14, 2021, Dr. David Marks at the VA directed Dr. Zhou to abandon a VA patent application because of the pending allegations, even though the investigation was not complete.

37.     Also in 2021, Dr. Eckert escalated his retaliation against Dr. Zhou. In February, Dr. Zhou requested access to financial records for his NIH R01 grant (5R01CA157779) to certify the final report required by NIH policy. Dr. Eckert ignored the request.

38.     On August 10, 2021, NIH informed Dr. Zhou that UMB had already submitted the final financial report in March 2021 without his review or signature, violating NIH policy and depriving him of oversight of his own grant funds.

39.     In the fall of 2021, Dr. Zhou prepared a new NIH proposal, but Dr. Eckert delayed approval of his grant budget justification, blocking timely submission. On September 23, 2021, Dr. Zhou reported this retaliation to Dr. Terry Rogers, Research Associate Dean of Research.

40.     On October 14, 2021, Dr. Eckert summoned Dr. Zhou to a meeting and told him he had difficulty obtaining grants because of "poor English" and "Chinese English." He warned that without new funding Dr. Zhou could not maintain his faculty position. Other white faculty members, including Drs. Gerald Wilson and Richard Thompson, had failed to secure NIH funding for years but were not threatened with termination. Instead, they were promoted.

41.     On October 27, 2021, Dr. Eckert directed department staff to withhold approval for a collaboration with Regio Biosciences that would have provided Dr. Zhou research funding. As a result, the company abandoned the project. Meanwhile, Dr. Eckert successfully obtained new

research funding in December 2020 and May 2022 for his own projects, demonstrating that retaliation was targeted only at Dr. Zhou.

42.    On March 3, 2022, Dr. Zhou submitted a comprehensive rebuttal to the draft investigation report, providing thirty-eight documents of new and overlooked evidence that refuted the allegations. On July 11, 2022, Committee Chair Dr. Krueger summarily dismissed Dr. Zhou's submissions as "not credible" without analysis or explanation.

43.    Dr. Zhou continued submitting additional materials, including emails, letters, and data, but each was rejected without consideration. In July 2022, the investigation committee issued its final report. The report falsely claimed that Dr. Zhou had failed to provide notebooks or raw data, even though Dr. Vigues had refused to collect them.

44.    The committee dismissed approximately seventy data files Dr. Zhou had provided on an external hard drive, rejecting them as unauthenticated, but paradoxically relied on one of those files claiming errors in a journal publication. The committee discredited testimony from Chinese lab members while relying heavily on unsubstantiated statements from non-Chinese witnesses.

45.    On August 16, 2022, Dr. Zhou received the final Investigation Report. It was nearly identical to the draft, ignored his rebuttals, and failed to correct factual errors, in violation of federal regulations requiring institutions to consider respondent comments.

46.    On December 8, 2022, the UMB President upheld the investigation committee's findings and the decision to terminate Dr. Zhou. On March 6, 2023, UMB initiated the tenured-faculty termination process and notified Dr. Zhou of his termination and the charges against him.

47.    UMB policy allowed Dr. Zhou to elect either a hearing before a faculty board of review or before an impartial hearing officer. Dr. Zhou repeatedly asked UMB (from March 27,

2023 through May 3, 2023) to provide the specific procedures governing a hearing before an impartial hearing officer.

48.     Because UMB did not provide those procedures, on May 3, 2023, Dr. Zhou preserved his rights by requesting a hearing before a faculty board of review; on May 4, 2023, UMB confirmed he met the deadline and that termination was on hold. Dr. Zhou continued to request the impartial-hearing-officer procedures and indicated his preference to proceed before an impartial hearing officer once those procedures were provided.

49.     On July 13, 2023, the UMB Faculty Senate President sent Dr. Zhou a list of proposed members for the faculty board of review. Dr. Zhou raised concerns about conflicts and independence. On July 18, 2023, Dr. Zhou requested a hearing before an impartial hearing officer unaffiliated with UMB leadership and without conflicts of interest.

50.     On July 24, 2023, Dr. Zhou filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC No. 531-2023-03171) alleging discrimination based on race and national origin (Asia-Chinese), hostile work environment and retaliation. The complaint detailed a pattern of targeted, biased investigations and the deliberate creation of intolerable working conditions based on his protected characteristics.

51.     On August 14, 2023, UMB denied the request for an impartial hearing officer without explanation and on August 17, 2023, UMB reversed course and agreed to provide an impartial hearing officer but still did not provide procedures.

52.     On September 11, 2023, UMB appointed an Assistant Vice President as the impartial hearing officer and informed Dr. Zhou that he would not be permitted to call witnesses and that there would be no cross-examination, pursuant to the University System of Maryland Board of Regents Appeal Procedures (Policy II-1.04.7, the "USM Appeal Policy"). The USM Appeal Policy governs

appeals to the Board of Regents and stipulates two critical conditions. This policy could only be invoked after UMB has fully completed its own internal hearing process, including any review by an impartial hearing officer or a faculty review board. Further, the USM Appeal Policy explicitly prohibited the introduction of witnesses or cross-examine witnesses at the USM appeal stage. Ms. O'Neill incorrectly cited this policy to bar cross-examination as UMB had not yet concluded its internal hearing process, making her refusal unjustifiable.

53.     On November 15, 2023, the UMB hearing proceeded before the impartial hearing officer. Dr. Zhou was not permitted to call witnesses or to cross-examine witnesses. Section III(F) of the UMB Procedure for the Faculty Board of Review in Faculty Termination Cases unequivocally guarantees the right to call witnesses. This right is a cornerstone of due process.

54.     In December 2023, Dr. Zhou sought support for ongoing research needs. On December 15 and December 20, 2023, he asked the interim department chair to certify his lab's cell-culture hood, which was due to expire in January 2024. The department did not provide the requested certification.

55.     By March 2024, the psychological harm had become medically undeniable. Dr. Hao Yang Tan of Johns Hopkins Psychiatry diagnosed Dr. Zhou with Major Depressive Disorder, documenting symptoms including severe emotional distress, chronic insomnia and anxiety. Ms. O'Neill, confirmed Dr. Zhou's severe distress, stating, "It's been five years of unimaginable stress. I can't say… I know what it's like to be in your shoes."

56.     On March 8, 2024, Dr. Zhou reported to UMB leadership that the department had declined to certify the lab hood despite his requests.

57.     On July 1, 2024, Dr. Zhou filed a new submission to the EEOC relating to the same charge, alleging retaliation and that he had been deprived of the right to call and cross-examine witnesses at the November 15, 2023 hearing.

58.     On September 24, 2024, in connection with Dr. Zhou's ongoing challenge to his termination, he sought access to evidence he asserted was material to certain allegations, including data files he stated had been reviewed by UMB leadership.

59.     In late 2024, Dr. Zhou pursued appeal to the University System of Maryland Board of Regents. In November 2024, the Regents denied his appeal, citing lack of substantial evidence in the record. On November 17, 2024, after UMB had blocked his university email account, Dr. Zhou requested copies of his UMB emails so that he could supply records to the EEOC. UMB did not provide the emails.

60.     On January 27, 2025, Dr. Zhou filed "New Claims" with the EEOC relating to his existing charge, asserting that UMB refused to provide key evidence for his hearing and appeal, including data files, and that UMB's blocking of his email account prevented him from supplying evidence to the EEOC.

61.     In that filing, Dr. Zhou stated that on or about May 15, 2025, he was terminated; he further stated that he appealed on or about May 16, 2024 and that his appeal was denied in November 2024.

62.     On April 28, 2025, UMB submitted an additional EEOC position statement addressing Dr. Zhou's amended/continued claims and the termination and appeal outcomes.

63.     On July 17, 2025, the EEOC issued a Notice of Right to Sue to Dr. Zhou.

64.     UMB subjected Dr. Zhou to a baseless, malicious investigation—destroying his reputation, career, and mental health. UMB forced him to endure constant depression, humiliation, and unimaginable stress, culminating in the termination of his employment.

## COUNT I
**Violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII")**
**42 U.S.C. § 2000e et seq.**
**(Race and National Origin Discrimination)**
**Disparate Treatment**

65.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

66.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), makes it unlawful for an employer to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race and national origin, among other protected categories.

67.     Plaintiff is an Asian American of Chinese national origin and was, at all relevant times, a tenured Associate Professor employed by Defendant UMB.

68.     Defendant UMB was aware that Dr. Zhou is Asian, of Chinese national origin, a member of a protected class under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

69.     Defendant discriminated against Plaintiff on the basis of race and national origin by denying him equal terms and conditions of employment, including mentorship, resources, promotions, and research support, while treating non-Chinese colleagues more favorably; subjecting him to adverse employment actions including, among other things, Defendant UMB's conducting an unfair investigation and treating him less favorably than similarly situated individuals outside his protected class.

70.    Defendant engaged in a course of conduct that resulted in the disparate treatment of Dr. Zhou. This conduct included, but was not limited to, depriving him of mentorship and authorship opportunities that were routinely provided to comparable colleagues outside of his protected class.

71.    Between 2014 and 2023, Defendant failed to conduct annual reviews of Plaintiff's work, denied him mentorship routinely provided to white colleagues, and excluded him from departmental support structures necessary for career advancement.

72.    Department Chair Dr. Richard Eckert made discriminatory remarks, including that he did not want Plaintiff in the department and disparaged his "Chinese English."

73.    Defendant undermined Plaintiff's supervisory authority by approving Dr. Duru's NIH grant without his involvement and transferring her out of his lab, actions not taken against white faculty. Defendant obstructed Plaintiff's NIH submissions, blocked his external collaborations, and deprived him of control over his NIH R01 grant funds, while supporting white faculty in similar or worse circumstances.

74.    In 2018, an anonymous complaint was expanded into a misconduct inquiry against Plaintiff, even though he had previously reported the very data at issue. Defendant's officers refused to collect Plaintiff's notebooks, later using their absence against him. Meanwhile, when UMB found Dr. Eckert guilty of misconduct in 2019, it promoted him to Deputy Director of the Cancer Center instead of pursuing discipline.

75.    Defendant subjected Plaintiff to an investigation that was fundamentally biased and racially motivated, as evidenced by the following: a. The investigation committee systematically credited and relied solely on testimony from non-Chinese witnesses while dismissing, without reasonable justification, all evidence and testimony provided by Dr. Zhou and other Chinese witnesses. The committee explicitly concluded that non-Chinese witnesses were inherently "more

15

reliable" than Chinese witnesses, demonstrating explicit racial and national origin bias; b. UMB deliberately ignored exculpatory evidence, misrepresented evidence, and exaggerated or misconstrued negative evidence against Dr. Zhou. This abuse of the investigative process resulted in a fundamentally unfair proceeding designed to reach a predetermined, negative outcome; and c. The markedly different investigative approaches—a five-year scrutiny of Dr. Zhou's complete research history versus a 10-month examination of a select few of Dr. Eckert's papers—inherently demonstrate a discriminatory intent and disparate treatment.

76. Ultimately, Defendant terminated Plaintiff following a biased, conflicted, and retaliatory investigation. Defendant's conduct constitutes unlawful race and national origin discrimination in violation of Title VII. Defendant imposed harsher and more punitive sanctions on Plaintiff, including termination, for alleged conduct for which similarly situated non-Asian-Chinese comparators received less severe or no discipline.

77. As a direct and proximate result of Defendant's actions, Plaintiff has suffered emotional distress and pain and suffering.

78. Defendant's actions directly and proximately caused Plaintiff to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering, stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

79. Defendant engaged in their discriminatory actions described above with malice or with reckless indifference to Plaintiff's legal rights.

80. Defendant had no legitimate business reason for any such acts.

81.     Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

## COUNT II
**Violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII")**
**42 U.S.C. § 2000e et seq.**
**(Race and National Origin Discrimination)**
**Hostile Work Environment**

82.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

83.     An employer violates Title VII when the workplace is permeated with discriminatory intimidation, ridicule, or insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.

84.     Defendant subjected Plaintiff to a hostile work environment and harassment based on his race (Asia-Chinese) and national origin (China). This conduct was unwelcome, severe, and pervasive, altering the conditions of his employment and creating an abusive working environment. Defendant engaged in discriminatory conduct by taking tangible adverse employment actions against Plaintiff because of his protected status. Specifically, Defendant denied him promotions that were instead awarded to non-Asian-Chinese colleagues who had committed research misconduct.

85.     Defendant subjected Plaintiff to a hostile work environment based on his race and national origin through repeated derogatory remarks, disparate treatment, and persistent undermining of his professional role.

86.     Dr. Eckert demeaned Plaintiff's background by stating he did not want Plaintiff in the department and disparaged his "Chinese English," while threatening his position if he failed to obtain funding.

87.    Plaintiff was denied mentorship, annual reviews, and research resources that were regularly afforded to his white colleagues.

88.    Defendant undermined Plaintiff's authority as a principal investigator by stripping him of control over lab members, interfering with his supervision, and transferring his postdoctoral fellow without his consent.

89.    Beginning in 2018, Plaintiff was subjected to a protracted misconduct investigation marked by bias and hostility. Defendant's Research Integrity Officer refused to collect notebooks and data supporting Plaintiff, then falsely reported that none existed.

90.    Defendant appointed committee members with conflicts of interest, dismissed Plaintiff's objections, and allowed them to remain in roles influencing the investigation.

91.    During interviews, Plaintiff was mocked and told he was "very stressful" by officials conducting the inquiry, who also threatened to report him to federal authorities for seeking reasonable accommodations.

92.    In 2021, Defendant breached confidentiality rules, disclosing details of the investigation to colleagues who was not involved. The disclosures harmed Plaintiff's reputation, led collaborators to withdraw, and caused the VA to abandon a patent application.

93.    Defendant tolerated misconduct by white colleagues, including Dr. Eckert, while targeting Plaintiff for removal.

94.    In 2023, the hostile environment extended into termination proceedings, where Plaintiff was denied the right to call or cross-examine witnesses, further undermining his ability to defend himself.

95.     Defendant's conduct was severe, pervasive, and continuous over many years, creating an abusive and discriminatory work environment that culminated in Plaintiff's termination. Defendant's conduct constitutes a hostile work environment in violation of Title VII.

96.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered emotional distress and pain and suffering.

97.     Defendant's actions directly and proximately caused Plaintiff to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering, stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

98.     Defendant engaged in their discriminatory actions described above with malice or with reckless indifference to Plaintiff's legal rights.

99.     Defendant had no legitimate business reason for any such acts.

100.    Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

### <u>COUNT III</u>
### Violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII")
### 42 U.S.C. § 2000e-2(a)
### (Retaliation)

101.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

102.    Title VII, 42 U.S.C. § 2000e-3(a), makes it unlawful for an employer to retaliate against an employee for opposing discriminatory practices, filing charges with the EEOC, or participating in proceedings under Title VII.

103.    Plaintiff engaged in protected activity by raising complaints of discrimination internally, opposing retaliatory treatment, and filing EEOC charges beginning July 24, 2023 (EEOC No. 531-2023-03171), with amendments on July 1, 2024, and January 27, 2025.

104.    After engaging in this protected activity, Plaintiff was subjected to escalating retaliation.

105.    UMB retaliated against Dr. Zhou by the denial of his right to call witnesses, the denial of his right to cross-examine witnesses, the refusal to collect evidence from his own experimental notebooks; and the refusal to provide Dr. Wolfson's data files necessary for his defense. Defendant deprived Plaintiff of a fair termination hearing, despite established procedures guaranteeing those rights.

106.    Defendant retaliated against Dr. Zhou for exercising his right to oppose and seek redress for discrimination on the bases of race and national origin. These retaliatory actions included, but were not limited to: a. Dr. Vigues, in retaliation for Dr. Zhou's complaint, refused to collect exculpatory evidence from experiment books and then falsely reported to the investigation committee that Dr. Zhou never maintained any experimental notebooks. This conduct was a proximate cause of Dr. Zhou's termination, which was based on the false premise that he failed to maintain records; b. Dr. Krueger, acting with retaliatory motive, arbitrarily denied and refused to consider all evidence provided by Dr. Zhou. Dr. Krueger failed to provide any reasonable justification for this refusal, instead baselessly stating in the investigation report that Dr. Zhou's submissions were "not credible"; c. Dr. Eckert retaliated against Dr. Zhou by falsely prohibiting his grant submission, barring his promotion, and subjecting him to heightened surveillance. Furthermore, after Dr. Zhou filed his complaint, Dr. Eckert issued a discriminatory evaluation falsely determining that Dr. Zhou was not competent in teaching. These actions were intended to, and did,

create a hostile working environment, harm Dr. Zhou's professional reputation, cause his colleagues to avoid him, and stymie his ability to conduct important, long-term research; and d. The biased and pretextual investigation, culminating in termination, was itself an act of retaliation for Dr. Zhou's protected activity.

107.    Defendant impeded Plaintiff's research by refusing to certify his laboratory hood in December 2023 and early 2024, despite repeated requests, making it impossible for him to continue certain research activities. Defendant obstructed Plaintiff's defense by refusing to provide key evidence, including data files cited in the misconduct findings, and by blocking his university email account in 2024, preventing him from producing evidence for the EEOC.

108.    In November 2024, Defendant rejected Plaintiff's request to provide his own email records for EEOC proceedings, further undermining his ability to pursue his claims. Defendant also retaliated by disclosing confidential information about the misconduct case in 2021, causing reputational harm and loss of professional opportunities.

109.    Defendant escalated its actions into outright termination of Plaintiff's tenured position, a drastic measure that came after Plaintiff's discrimination complaints and EEOC filings.

110.    Defendant's actions constitute unlawful retaliation in violation of Title VII.

111.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered emotional distress and pain and suffering.

112.    Defendant's actions directly and proximately caused Plaintiff to suffer and to continue to suffer loss of income and other financial benefits, emotional distress, pain, suffering, stress, humiliation, loss of enjoyment of life, and damage to his reputation and career, and further loss of future professional opportunities.

113.    Defendant engaged in their discriminatory and retaliatory actions described above with malice or with reckless indifference to Plaintiff's legal rights.

114.    Defendant had no legitimate business reason for any such acts.

115.    Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory and retaliatory practices that are not yet fully known.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Dr. Zhou respectfully requests that this Court grant the following relief:

A.    That the Court issue an Order declaring Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.;

B.    Enter judgment against Defendant;

C.    Issue a permanent injunction prohibiting Defendant from engaging in any further acts of discrimination, harassment, and retaliation;

D.    Enter judgment in favor of Plaintiff against Defendant for all equitable monetary damages available under the law;

E.    Order reinstatement of Plaintiff to his former position with full rights and benefits, or alternatively award front pay; and to refrain from any action against Plaintiff, or any other person, for participating in or supporting this case in any manner;

F.    Award back pay, lost benefits, and other equitable relief to make Plaintiff whole;

d.    Award compensatory damages for emotional distress, humiliation, and loss of professional reputation;

G.    Award damages to deter future discrimination and retaliation in the amount of $5,000.000;

H.    Award Plaintiff's reasonable attorney's fees, expert fees, and costs;

I.    Award pre-judgment and post-judgment interest as allowed by law; and

J.    Grant such other relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable against Defendant.


Date: October 9, 2025                              Respectfully submitted,


                                                          /s/ *David A. Branch*
                                                   David A. Branch
                                                   Bar No. 22862
                                                   Law Office of David A. Branch &
                                                   Associates, PLLC
                                                   1120 Connecticut Avenue, NW, Suite 500
                                                   Washington, D.C. 20036
                                                   Phone: (202) 785-2805
                                                   Fax: (202) 785-0289
                                                   Email: davidbranch@dbranchlaw.com